IN THE UNITED STATES BANKRUPTCY COURT WITHIN AND FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:  MICHAEL TRENT WILSON, ) | |
| ) | |
| DEBTOR. ) | CASE NO. 13-15248 SAH |
| ) | |
| ) | CHAPTER 7 |
| BANK 7, a state banking association and acquirer ) | |
| of First State Bank of Camargo through FDIC ) | |
| receivership, ) | |
| ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | ADV. 14-01011 |
| ) | |
| MICHAEL TRENT WILSON, ) | |
| ) | |
| DEFENDANT. ) | |

**DEFENDANT'S RESPONSE TO TRUSTEE'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

**COMES NOW,** Defendant, Michael Trent Wilson, and responds and objects to the Motion for Summary Judgment filed by Bank 7, and in support state as follows:

**RESPONSE TO FACTUAL BACKGROUND TO THE MOTION**

Bank 7 attempts to render the subject debt by alleging that Trent Wilson lied to them by furnishing them two (2) false Farm and Home Plans.  What the evidence shows with this Response is that:

1. The Farm and Home Plans contained estimates of cattle and crops to be purchased if the loans were given (Exhibits 1, 2, 3, and 4).

2. Gregg Ward, President of the First State Bank of Camargo, confirmed that the cattle listed in the Farm and Home Plans were planned purchases and not actual assets (Exhibit 4).

3.	Trent Wilson did not lie on either of the Farm and Home Plans sued upon herein. (Exhibit 1)

4.	The Bank's Application for Loan Guarantee states the reason for the loan was to "purchase resale livestock". (Exhibit 5)

5.	Trent Wilson's mother, Ellen Wilson, confirmed that she had a conversation with Gregg Ward regarding that the loans were to be made to allow Trent Wilson to purchase cattle and to get him "back in the business." The Bank's Application for Loan Guarantee states the reason for the loan was to "purchase resale livestock". (Exhibit 6)

6.	There are questions of fact regarding the Bank's reliance on the alleged false Farm and Home Plans. Prior to entering the loans, the Bank conducted its own appraisal by using Tom Eike who confirmed to the Bank the existence of Cattle. (Exhibit 7). (See also, testimony of Gregg Ward, (Exhibit 3).

To inform the Court, the Bank of Camargo failed and went into receivership under the Federal Deposit Insurance Corporation. Bank 7 later purchased the assets of The Bank of Camargo in January 2011. The Bank of Camargo failed due to risky loan practices and generally failing to have sufficient assets to offset its liabilities. At the heart of this bank failure and this case, are the actions of Gregg Ward, The Bank of Camargo's President at the time the subject loans were made and the bank's President at the time the bank failed. His testimony is key and is attached hereto as an exhibit. (Exhibit 4). The Court should take specific notice of Mr. Ward's testimony when he testifies the cattle and crops listed on the Farm and Home Plans, which are now alleged to be fraudulent, were only projections of cattle and crops that were to be purchased with the loans. Moreover, the Bank did not rely on the alleged fraudulent Farm and Home Plans prior to making the

loan. The Bank prepared the Farm and Home Plans and told Mr. Wilson that they had to be signed in order to obtain Farm Service Agency Guaranty. Further, the Bank employed Tom Eike to conduct an appraisal of the cattle prior to entering into the loan.

Debtor produces evidence with this Response that clearly controverts the allegations of Bank 7. Specifically, he did not lie to the Bank of Camargo to obtain the loans sued upon. Further, Mr. Wilson testifies that he did not receive the proceeds from the loans in question. Further complicating Bank 7's case is that any evidence propounded by Bank 7 is suspect because the loans were made years before Bank 7 purchased The Bank of Camargo. The Farm and Home Plans (Exhibits 2 and 3) clearly identify that the cattle purchases and crops were planned. Further, the U.S. Department of Agriculture Application for Guarantee (page 3, part D of Exhibit 5) clearly states, the funds purpose is to "purchase resale livestock." Tom Eike's appraisal was conducted by the Bank prior to the loans. (Exhibit 7)

Any evidence Bank 7 propounds is merely hearsay and will not support either a Motion for Summary Judgment or judgment at trial.

## TRENT WILSON'S STATEMENT OF DISPUTED MATERIAL FACTS

1. Mr. Wilson admits material fact No. 1.
2. Mr. Wilson admits material fact No. 2.
3. Mr. Wilson admits material fact No. 3.
4. Mr. Wilson admits material fact No. 4.
5. Mr. Wilson admits material fact No. 5.
6. Mr. Wilson admits material fact No. 6.
7. Mr. Wilson admits material fact No. 7.

8.  Mr. Wilson admits material fact No. 8.

9.  Mr. Wilson admits material fact No. 9.

10. Mr. Wilson disputes material fact No. 10. (Authority: Affidavit of Trent Wilson, Exhibits 1, 8 and 9). The amounts stated in the judgment are inaccurate. Loan #'s 81470 and 81471 were paid in 2007.

11. Mr. Wilson admits paragraph 11.

12. Mr. Wilson disputes paragraph 12 in that his financial condition was verified through the FSA Guaranteed Loan Narrative and Guarantee Applications. He was required to sign Farm and Home Plans that were prepared by the Bank that contained estimates of collateral he would purchase if the loans were given. (Authority: Exhibits 1, 2, 3, and 4)

13. Mr. Wilson disputes paragraph 13 in that the Farm and Home Plans were estimates of cattle he was to purchase if the loans were made. (Exhibits 1, 2, 3, and 4) Gregg Ward confirms that these were representations of what would be purchased with the loan proceeds.

14. Mr. Wilson admits paragraph 14 and further states this information was told to Gregg Ward prior to the execution of the loans. (Authority: Exhibit 1)

15. Mr. Wilson disputes paragraph 5 in that the Farm and Home Plan dated April 7, 2010, contained only estimates of cattle and livestock to be purchased. (Authority Exhibit 1, 3 and 4)

16. Mr. Wilson admits paragraph 16 and further states this information was told to Gregg Ward prior to the execution of the loans. (Authority: Exhibit 1)

17. Mr. Wilson disputes paragraph 17. The Bank did not rely on the Farm and Home Plans. Gregg Ward testified that the Bank used Tom Eike as the appraiser and person on whom he relied to "package" the subject loans. (Authority: Exhibit1, Exhibit 4, Exhibit 7)

## STATEMENT OF MATERIAL CONTROVERTED FACTS
## REGARDING THE FARM AND HOME PLANS

1. Trent Wilson has engaged in a family ranching for many years. (Authority: Exhibit 1)

2. To support Mr. Wilson's family ranching operations, he conducted banking activities with the First State Bank of Camargo. Mr. Wilson's banking relationship began in 1988 and he is familiar with the banking practices of the First State Bank of Camargo. (Authority: Exhibit 1)

3. The person primarily responsible for Mr. Wilson's loans with the First State Bank of Camargo was Gregg Ward. Gregg Ward was the President of The First State Bank of Camargo during all the time in which Mr. Wilson banked there. Gregg Ward was Mr. Wilson's loan officer. (Authority: Exhibits 1 and 4)

4. Trent Wilson is familiar with the notes on which The First State Bank of Camargo has sued upon. (Authority: Exhibit 1)

5. The First State Bank of Camargo Loan No. 87985 was an alleged renewal of First State Bank of Camargo Loan No. 81470. However, Loan No. 81470 was paid in full. (Authority: Exhibits 1 and 8)

6. The First State Bank of Camargo Loan No. 81470 was paid in full on September 28, 2007. (Authority: Exhibits1 and 8)

7. The First State Bank of Camargo Loan No. 87986 was a renewal of First State Bank of Camargo Loan No. 81471. However, Loan No. 81471 was paid in full. (Authority: Exhibits 1 and 9)

5

8.       First State Bank of Camargo Loan No. 81471 was paid in full on September 28, 2007. (Authority: Exhibits 1 and 9)

9.       First State Bank of Camargo Loan No. 81470 and 81471 were not renewals of Loan No. 87985 and 87986. (Authority: Exhibit 1)

10.      First State Bank of Camargo Loan No. 87985 and 87986 were not renewals of Loan No.'s 81470 and 81471 as they were executed three years after Loan No.'s 81470 and 81471 were paid. (Authority: Exhibit 1)

11.      The notes sued upon by Bank 7 were executed on April 21, 2010. Out of all the notes sued upon, the Bank of Camargo paid the following credit cards; Chase Bank- $2,165.00; Bank of America- $10,996.00; Capital One- $3,110.00 and Applied Bank Credit Card $9,065.00. Mr. Wilson did not receive any other loan proceeds, except Mr. Wilson was informed approximately on April 13, 2010, by Merlanda Kline, a secretary with the Bank of Camargo that he only had approximately a $25,000.00, line of credit with the Bank. Mr. Wilson asked her why he only had that low of a line of credit. Ms. Kline told him that he had to speak with Gregg Ward. Over the next several months Mr. Wilson attempted to meet with Gregg Ward to discuss the low line of credit, but Mr. Ward avoided meeting with me. The F.D.I.C. took over the Bank before Mr. Wilson could discuss that fact that he only had a $25,000.00 line of credit. (Authority: Exhibit 1)

12.      The loans sued upon by Bank 7 were FSA guaranteed loans. Mr. Wilson was told by Gregg Ward that in order for the Bank to obtain an FSA loan guarantee, a plan had to be put into place that would show what was anticipated to be done with the loan proceeds. (Authority: Exhibits 1 and 4)

13. Before the loans were given, Mr. Wilson went into the Bank and was presented the Farm and Home Plans. These plans were prepared by the First State Bank of Camargo and they were statements that showed what was to be done with the loan proceeds after the loans were given. (Authority: Exhibit 1)

14. Prior to entering into the loans, Gregg Ward told Mr. Wilson that the Bank had to get a plan in place and they had to put numbers of livestock and crops in the plan in order to get the loan guarantee approved by the FSA. (Authority: Exhibits 1 and 4)

15. Also, prior to entering into any loans and signing the Farm and Home Plans, Mr. Wilson told Gregg Ward, that he had less than 100 head of cattle. Gregg Ward told Mr. Wilson that they just had to get a plan together in order for the loan to be approved and that was the purpose of the Farm and Home Plans. (Authority: Exhibits 1 and 4)

16. The Farm and Home Plan dated October 19, 2009, and signed by Mr. Wilson on November 4, 2009, was prepared by The First State Bank of Camargo and was presented to him as a plan of livestock and wheat that would be purchased if the loan was approved. At no time did Mr. Wilson represent that he owned the livestock or wheat. (Authority: Exhibit 1)

17. The Farm and Home Plan dated October 19, 2009, and signed by Mr. Wilson identifies cattle on page 3, under the heading, "Planned". (Authority: Exhibits 1 and 2)

18. The Farm and Home Plan dated October 19, 2009, and signed by Mr. Wilson identifies no cattle on page 3, under the heading, "Actual". (Authority: Exhibits 1 and 2)

19. The Farm and Home Plan dated October 19, 2009, and signed by me identifies wheat on page 3, under the heading, "Planned". (Authority: Exhibits 1 and 2)

20. The Farm and Home Plan dated October 19, 2009, and signed by me identifies no wheat on page 3, under the heading, "Actual". (Authority: Exhibits 1 and 2)

21. The Farm and Home Plan dated and signed on April 7, 2010, was prepared by The First State Bank of Camargo and was presented to Mr. Wilson as a plan of livestock and wheat that would be purchased if the loan was approved. It was Mr. Wilson's understanding that this Farm and Home Plan was the same as the Farm and Home Plan dated October 19, 2009. Gregg Ward asked Mr. Wilson to sign this second Farm and Home Plan because he told him that the Farm Service Agency needed to have one that was signed on a date closer to the date of the loans. At no time did Mr. Wilson represent that he owned the livestock or wheat listed on the plan and he made it clear to Gregg Ward on that day. (Authority: Exhibit 1)

22. The Farm and Home Plans were proposals to obtain additional livestock and crops and both Farm and Home Plans were not representations of either cattle or crops that Mr. Wilson owned at that time. Mr. Wilson had discussions with Gregg Ward each time prior to signing the Farm and Home Plans and he told Gregg Ward that he did not have the cattle or crops that were listed on the Farm and Home Plans. Because he did not have either cattle or crops for security, Gregg Ward requested Mr. Wilson's parents, Flakey and Ellen Wilson, had to pledge an additional approximately 160 acres of their real estate to secure the new loans. (Authority: Exhibit 1)

23. Gregg Ward assured Mr. Wilson that the Farm and Home Plans were proposals only and that they had to be signed in the manner in which they were prepared in order to obtain the FSA Guarantee. (Authority: Exhibit 1)

As has been previously maintained, Mr. Wilson has not made a fraudulent misrepresentation under Section 523(a)(2)(B). Mr. Wilson through affidavit testimony clearly indicates that he did not

8

intentionally misrepresent assets on the Farm and Home Plans, which now Bank 7 claims as being false.

Mr. Wilson repeatedly testified in his Affidavit that his conduct was upon the advice of Gregg Ward; that he relied on this advice in the conduct. Moreover, Mr. Wilson testifies that the information in the Farm and Home Plans were **PLANS** to obtain the listed cattle. Gregg Ward, the Bank of Camargo's President, confirms that the stated cattle were the amount of cattle *to be obtained* if the loans were approved. (Page 19, lines 23-25; Page 20, line1, Gregg Ward deposition, exhibit 3) For example, when asked by Mr. Wilson's attorney about additional collateral listed on the Farm and Home Plans, Mr. Ward testified, "I know this is a proposal that he wanted more cattle." (Page 20, line 16, Gregg Ward deposition, Exhibit 4) Further, Gregg Ward supports Mr. Wilson's testimony that he actually did not receive the loan proceeds represented by the alleged loans. When asked if the Bank actually loaned Mr. Wilson the money, Mr. Ward testified, "No. I don't recall - I don't think we did because we were waiting for this to get done." (Page 22, lines 6-7, Exhibit 4) Gregg Ward's testimony, alone, prevents the court from sustaining Bank 7's Motion for Summary Judgment.

### ARGUMENT AND AUTHORITY

### SUMMARY JUDGMENT IS NOT APPROPRIATE AS MATERIAL FACTS ARE IN DISPUTE.

Generally, exceptions to discharge are narrowly construed in favor of the debtor. In re Lowther, 266 B. R. 753 (10th Cir. BAP 2001); In re Neal, 324 B.R. 365 (BK WD Okla. 2005). Plaintiff's Motion seeks judgment on Count II or under 11 U.S.C. § 523(a)(2)(b), which states:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —

>> (B) use of a statement in writing —
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive;

See, In Re Cribbs, 327 B.R. 668 (10th Cir. BAP. 2005). The creditor has the burden to prove each element of the claim by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### a. Intent Under § 523(a)(2)(b).

A finding of reckless disregard of intent should be very narrowly interpreted because a misrepresentation is fraudulent only if the maker "knows or believes the matter is not what he represents it to be." Chevy Chase Bank FSB v. Kukuk (In re Kukuk), 225 B.R. 778, 787 (10th Cir. BAP 1998), citing Restatement (Second) of Torts § 526(a) (1976). See also In re Cribbs, 327 B.R. 668 (10th Cir.BAP 2005). Here, there was no intent to defraud. Mr. Wilson testified that the Farm and Home Plans (the alleged nefarious and fraudulent documents) were PROPOSALS to obtain the cattle and crops listed. Gregg Ward, the Bank's President confirms in his deposition that they were just plans.

Second, intent is a subjective inquiry. McCain Foods U.S.A., Inc. v. Shore (In re Shore), 317 B.R. 536, 542 (10th Cir. BAP 2004) (discussion of context of § 523(a)(6)); In re Kukuk, 225 B.R. at 786-787 citing Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store), 221 B.R. 265, 272 (Bankr.N.D.Okla.1998). Clearly, Trent Wilson and Gregg Ward understood that the statement

regarding cattle and crops were estimates of what was to be purchased in the event the loan was given. A subjective inquiry would require a trial on the merits and not through a Motion for Summary Judgment.

### b. Reliance under Sec. 523 (a)(2)(b)

To establish a claim under § 523(a)(2)(B), the Bank must show reliance in fact, i.e., that it actually relied on the financial information, and that such reliance was reasonable. Rural Enters. of Okla. v. Watson (In re Watson), 294 B.R. 198, 2003 WL 21241702 *4 (10th Cir. BAP 2003), citing Field v. Mans, 516 U.S. 59, 68, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); Ramsey Nat'l Bank and Trust Co. v. Dammen (In re Dammen), 167 B.R. 545, 552 (Bankr.D.N.D.1994) (creditor must show it relied on the submitted information, at least in part). See also, In Re Cribbs, *supra*.

Further, a determination for dischargeability purposes, of reasonableness of a creditor's reliance on debtor's alleged materially false financial statement requires consideration of three factors: (1) creditor's standard practices; (2) standards or customs of creditor's industry in evaluating creditworthiness; and (3) surrounding circumstances existing at the time of debtor's application. In re Turner, 358 B.R. 422 (Bankr.N.D. Okla. 2006).

Again, Mr. Wilson testified that the Farm and Home Plans (the alleged nefarious and fraudulent documents) were PROPOSALS to obtain the cattle and crops listed. These proposals were prepared and promoted by the Bank. Gregg Ward, the Bank's President confirms in his deposition that they were just plans. Further, Gregg Ward testified that he didn't think the Bank ever loaned Trent Wilson the money. (See Exhibit 4) Trent Wilson testifies in his Affidavit that the Bank could have not reasonably relied on these statements when they employed Tom Eike to conduct an independent appraisal. (See Exhibit 7) In regards to reliance this is what Gregg Ward testified,

11

"Well, on the FSA guaranteed ones, they wanted someone separate in the bank to do the packaging, and he did all that. So I trusted Tom on doing – I'm not saying Tom or myself, but on the FSA guaranteed ones, he had the responsibility of getting what we needed because it had to go through the chains of the government to be able to – to pass through after we got our stuff done, then it had to pass them also." (Exhibit 4, page 12, lines 10-18) (See Exhibit 7) Gregg Ward stated the Bank relied on Ton Eike regarding "anything with the loans". (Exhibit 4, Pg. 11, lines 18-22). It is clear that the Bank could have not been defrauded when they were not only a participant in the preparation of the Farm and Home Plans, but were certainly complicit in their preparation and execution. Further, their own President confirms that the information contained in the Farm and Home Plans were estimates rather than actual inventory. Moreover, they relied on Ton Eike to do their due diligence for the loans.

     Mr. Wilson is entitled to have his day in Court to have the opportunity for him to testify that the claim of making fraudulent misrepresentations via the Farm and Home Plans was not knowingly and fraudulently committed. He should not be prevented from making a further explanation of his testimony and showing that he did not make a willful misstatement, following the holding of In Re Sheer, 201 F. 460 (D.C.N.Y. 1913). Furthermore, for an extension of this premise, see In Re Caufhold, 256 F.2d 181 (3rd Cir. 1958).

     Summary Judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Bankruptcy Rule 7056(c), as incorporating Federal Rule of Civil Procedure 56, Anderson v. Liberty Lobby, Inc., 477 U.S. 242(1986). There are significant and numerous factual allegations at

issue in this case, and summary judgment is inappropriate for that reason. Further, Defendant asserts that he reasonably relied on certain representations and advice of Gregg Ward, The Bank of Camargo's President concerning his disclosures, which would negate any finding of fraud in a Section 523 determination. Frankly, the only evidence before the court on the reliance element under 523(a)(2)(B) is that Gregg Ward relied on Tom Eike, <u>not</u> Trent Wilson in originating the loans.

Under considerations for a Motion for Summary Judgment, the Debtor has offered evidence controverting the allegations of the Bank so as to make the sustaining of a summary judgment not possible.

In the present case, the Debtor's alleged fraud and fraudulent intent is controverted. So, too, is the Bank's reliance on any alleged fraudulent representation. Accordingly, the Bank's Motion for Summary Judgment must be denied under Bankruptcy rule 7056 incorporating Federal Rule of Civil Procedure 56 and the Debtor's discharge should not be denied pursuant to Section 523(a)(2)(B).

<u>/s/ Bret D. Davis</u>
Bret D. Davis, OBA No. 15079
LAMUN MOCK CUNNYNGHAM & DAVIS, P.C.
5613 N. Classen Blvd.
Oklahoma City, Oklahoma  73118
(405) 840-5900 phone  (405) 842-6132 fax
Bdavis@lamunmock.com
ATTORNEYS FOR DEFENDANT, MICHAEL TRENT WILSON

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 11th day of July, 2014, I electronically transmitted the foregoing Defendant's Response to Trustee's Motion for Summary Judgment and Brief in Support, to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Brendon S. Atkinson, Esq.
**Atkinson@gungolljackson.com**
Attorney for Plaintiff

Susan J. Manchester, Esq., Trustee
**Susanmanchester@sbcglobal.net**

U.S. Trustee
Ustpregion20.oc.ecf@usdoj.gov

                                                /s/ Bret D. Davis
                                                Bret D. Davis, OBA No. 15079