**Dated: October 14, 2014,  02:51 PM**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

_____

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MICHAEL TRENT WILSON, | ) | Case No. 13-15248-SAH |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| BANK 7, a state banking association and | ) | |
| acquirer of First State Bank of Camargo | ) | |
| through FDIC receivership, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. 14-01011-SAH |
| | ) | |
| MICHAEL TRENT WILSON, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This action to determine the dischargeability of a debt was brought under 11 U.S.C. § 523

(a)(2)(A), (a)(2)(B) and (a)(6) and came on for trial on August 20, 2014.  Upon hearing the trial

testimony of witnesses and thoroughly examining all admitted exhibits, the Court finds that (i)

judgment should be entered in favor of Bank 7 and against Michael Trent Wilson ("Debtor") on

the Section 523(a)(6) claim in the amount of $35,750.00 and (ii) judgment should be entered in

favor of Debtor and against Bank 7 on the Section 523(a)(2)(A) and 523(a)(2)(B) claims for the

reasons that follow.  A separate Judgment shall be entered following entry of this Opinion and

Order.

## JURISDICTION AND VENUE

This Court has jurisdiction of the parties and of the subject matter pursuant to

28 U.S.C. § 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and

the parties consent to entry of judgment by this Court.  See Doc. 10.  Venue is proper under

28 U.S.C. § 1409(a).

## RELEVANT PROCEDURAL HISTORY

Bank 7 filed its Complaint against Debtor on February 5, 2014.  See Doc. 1.  On the

following date, the Court issued a summons against Debtor.  See Doc. 2.  Although no return of

service was filed, Debtor filed his Answer to Complaint to Determine Dischargeability of Debt

on February 27, 2014.  See Doc. 3.  On August 14, 2014, the Parties submitted their proposed

Final Pretrial Order, which was entered on August 15, 2014.  See Doc. 40.

## FINDINGS OF FACT

### Overview of Debtor's Operations and Lending Relationships

Until 2011, Debtor spent his professional career running stocker cattle.[1] While running

stocker cattle, Debtor purchased cattle for himself and others.  Generally, Debtor purchased such

cattle at the Oklahoma City Livestock Auction (the "Auction").  Debtor financed his cattle

---

[1]  In 2011, Debtor went to work for a chemical company, working in the oil fields, and
has remained in that job to the present date.

business through State Bank of Camargo ("State Bank"),[2] located in Camargo, Oklahoma, and, unbeknownst to State Bank, Wheeler Feed Yard ("Wheeler"), located in Wheeler, Texas. Debtor was a customer of State Bank for 25 years. In 2009, Debtor decided to expand his operations and needed additional financing for such operations so he worked with State Bank to obtain a loan (the "Loan") guaranteed by the Farm Service Agency (the "FSA"). Debtor had previously obtained other loans from State Bank, and such loans were guaranteed by FSA. Each time that Debtor sought a loan from State Bank, Gregg Ward[3] ("Ward"), its then-president, acted as his loan officer. When Debtor obtained an FSA-guaranteed loan, he was able to use it as a revolving line of credit. Thus, Debtor would purchase cattle using a State Bank account (the "Account") tied to his line of credit with State Bank. After months of feeding the cattle, he would resell them at various sale barns. When the cattle were resold in Oklahoma, the sale barns included both Debtor and State Bank on their checks based on State Bank's UCC and EFS filings. Once his line of credit was paid down by the cattle sale proceeds, Debtor would use his newly-available credit to buy more cattle intended for resale.

---

[2]Ultimately, in January 2011, State Bank failed, and Bank 7 acquired State Bank and assumed its assets including the Loan to Debtor.

[3]Ward was unavailable as a witness for trial due to his assertion of his Fifth Amendment right against self-incrimination. According to Ward's attorney, the FDIC is pursuing a civil enforcement suit against Ward relating to his time as president of State Bank. Meanwhile, Ward has entered into a voluntary agreement to toll the statutes of limitations relating to any criminal charges that might be brought against him. On January 18, 2013, Ward offered his testimony concerning the events that form the basis of the above-captioned adversary proceeding during the discovery phase of a civil suit filed by Bank 7 against Debtor in the District Court of Ellis County, Oklahoma. By agreement of the Parties, Ward's prior testimony was used in lieu of live testimony.

Debtor also purchased cattle at the Auction using Wheeler funds that Wheeler deposited into the Account post-purchase. When Debtor purchased cattle using Wheeler financing, he transported them to his Oklahoma ranch for preconditioning[4]. Debtor's version of preconditioning essentially involved introducing the cattle to grass grazing. Once the cattle became accustomed to grass grazing and began to put on weight, Debtor transported them to Wheeler in Texas. Wheeler kept the cattle in its feed lot until Debtor decided they were heavy enough to be resold. When Wheeler sold Debtor's cattle in Texas, the proceeds were paid to Debtor and Wheeler but not to State Bank because State Bank did not make UCC or EFS filings in Texas.

### Debtor's Proposed Expansion and the Loan

1. In 2009, Debtor decided to expand his cattle operation. As a result, Debtor met with Ward to discuss renewing his existing FSA-guaranteed loan and increasing his available line of credit.

2. State Bank would not consider an extension, renewal or other loan of additional funds to Debtor unless such loan was guaranteed by FSA. Debtor testified that he understood, at the time that he applied for the Loan, that he would not obtain the Loan unless FSA agreed to guarantee the Loan.

---

[4]"Preconditioning is the process of preparing calves to enter the stocker phase of the beef industry or to be directly placed in the feedlot. This process typically includes ranch management activities such as weaning, supplemental nutrition, dehorning, castration, and implementation of an animal health program including both deworming and vaccinations." J. Donnell, C. Ward & S. Swigert, "Costs and Benefits Associated with Preconditioning Calves," Oklahoma Cooperative Extension Service AGEC-247, at 1.

3.    Ward initiated the process by providing Debtor with the documents that make up an application for an FSA-guaranteed loan, consisting of (i) a loan narrative; (ii) application for guarantee; and (iii) a farm and home plan[5] (collectively, the "Loan Package").

4.    Although Ward ultimately made State Bank's lending decisions, he did not take the lead in completing the Loan Package for an FSA guarantee.

5.    Ward retained Tom Eike ("Eike") to prepare the Loan Package to submit to FSA.[6]  Eike is experienced and knowledgeable concerning FSA-guaranteed loan applications and origination; he has played a role in putting together approximately 60 such loan packages during his career, including FSA-guaranteed loans intended to finance a borrower's cattle operation.

6.    When retained to package a loan, Eike investigates a borrower's purported financial condition and reports his findings to the prospective lending institution.[7]

7.    When he is working on a Loan Package for an FSA guarantee of a loan intended to finance a borrower's cattle purchases, Eike also inspects and appraises the consumer's home,[8] equipment and existing cattle.

_____

[5]A farm and home plan is a set of financial statements.

[6]Eike is currently employed by the State of Oklahoma's Commissioners of the Land Office.  Previously, he spent multiple decades acting as an intermediary between banks and agricultural consumers seeking FSA-guaranteed loans.

[7]When working on a loan package, Eike performs a detailed cash flow analysis.  He also independently determines which loan provisions are favorable to the lender and which to the borrower.  Based on his analysis and determinations, Eike makes recommendations concerning desirable additional or revised loan provisions to both the lender and the borrower.

[8]Eike testified that lending institutions strongly prefer that the borrower pledge their house as collateral because nobody wants to lose their house, so fear of that loss gives the

8.    Because the FSA requires its loans to have a 1:1 ratio of collateral value to loaned funds,[9] Eike appraises a borrower's offered collateral and determines the lender's loan limit.

9.    Because Ward conditioned approval of the Loan upon obtaining the FSA's guarantee, Debtor's ability to obtain the Loan rested entirely upon his ability to offer up collateral equal or greater in value to the value of the amount of the Loan.

### Eike's Appraisal

10.    On September 4, 2009, State Bank sent Eike to Debtor's ranch to appraise his collateral.[10]

11.    While at the ranch, Eike counted Debtor's cattle and estimated the weight of each head. Eike relied upon Debtor to show him all of his cattle.

12.    Eike's Appraisal of Livestock Property, dated September 4, 2009 (the "Appraisal"), identified 472 head of cattle as being present on Debtor's ranch with a value of $305,930.00.  See Ex. 5.

### The Loan Package and its Contents

#### The Loan Narrative

13.    On November 3, 2009, Debtor and State Bank completed the Loan Package.  See Ex. 1.

---

borrower additional incentive to make loan payments.

[9]Both Eike and Ward testified concerning the FSA's hard and fast rule requiring a 1:1 ratio of collateral value to loaned funds.  Eike testified that he was present when Ward made Debtor aware of FSA's requirement.

[10]Debtor denies that Eike has been to his ranch and denies that Eike conducted an appraisal of his cattle.  Debtor's testimony on this and most other subjects was incredible. Almost always, Debtor's testimony was contradicted by all witnesses with personal knowledge concerning the same subject.  Likewise, the documents introduced into evidence tended to contradict Debtor's testimony.  Finally, Debtor's testimony was frequently contradictory and facially implausible.  For these reasons, the Court accepts Eike's testimony as true and rejects Debtor's testimony.

14.     Eike assisted in preparing the Loan Package and relied upon Debtor to accurately disclose his existing assets and liabilities.

15.     Eike verified Debtor's assets through inspection and appraisal and also verified Debtor's debts as provided to him by Debtor. Eike was never advised of any indebtedness being owed to Wheeler, of any cattle being financed by Wheeler, or of any Debtor-owned cattle being located at Wheeler in Texas.

16.     Debtor and State Bank's then-president, Ward, signed the Loan Narrative on November 4, 2009. See Ex. 1, at 1-5.

17.     The Loan Narrative contains the proposed terms of the Loan and describes Debtor's capital, including his balance sheet, liquidity, working capital and trends in asset quality. According to the Loan Narrative, Debtor's balance sheet as of October 19, 2009, represented that Debtor had "total farm assets of $623,680.00, total liabilities of $585,565.00, creating equity of $38,115.00." See Ex. 1, at 3. Debtor's current assets included livestock valued at $305,930.00 (consistent with Eike's Appraisal) and 225 acres of growing wheat valued at $6,750.00. See Ex. 1, at 3 and Ex. 5.

**The Application for Guarantee**

18.     The Loan Package also contains an Application for Guarantee, signed by Debtor, in which he affirmed that:

> I certify that I accept and comply with the conditions stated hereon. **I certify that the statements made by me in this application are true, complete, and correct to the best of my knowledge and belief and are made in good faith to obtain a loan.** I understand that the approval period will not begin until a complete application has been filed. (Warning: section 1001 of Title 18, United States Code provides for criminal penalties to those who provide false

statements on loans.  If any information on this application is found
to be false or incomplete, such finding may be grounds for denial
of the requested credit and civil and criminal prosecution.) [sic]

See Ex. 1, at 7 (emphasis added).

19.   Debtor pledged the following collateral in his Application for Guarantee:  owned real

estate ($101,500.00), pledged real estate ($134,000.00), machinery and equipment

($75,500.00), and resale cattle ($886,220.00).  See Ex. 1, at 10.

**The First Farm and Home Plan**

20.   Debtor also executed a Farm and Home Plan (the "First Plan") as part of the Loan

Package.  The First Plan is a combination of financial statements including, among other

documents, a current balance sheet and cash flow statements.  See Ex. 1, at 14.

21.   The balance sheet contained in the First Plan is dated as of October 19, 2009 (the

"October Balance Sheet").  See Ex. 1, at 14.

22.   Eike recorded the numbers that are reflected in the October Balance Sheet within the First

Plan.  He obtained the numbers from three (3) sources:  (i) State Bank, (ii) Debtor and

(iii) his own appraisal.

23.   Debtor executed the October Balance Sheet, certifying it "to be complete and correct."

See Ex. 1, at 14.

24.   The October Balance Sheet reflects the following about Debtor's financial condition as of

October 19, 2009:

a.      Debtor owned a total of 472 head of cattle with an aggregate value of $305,930.00

which is consistent with Eike's appraisal.  See Ex. 1, at 14; Ex. 5.

b.    Debtor owned 225 acres of wheat with a value of $6,750.00.[11]  See Ex. 1, at 14.

c.    Debtor owed indebtedness to the following creditors:  State Bank, Chase, Bank of America, Applied Bank, Capitol [sic] One, AHM (Honda) and Harris (vehicle) totaling $585,565.00.  See Ex. 1, at 14.

25.    Debtor did not disclose to Eike any indebtedness owed to Wheeler.  Eike also did not learn of Debtor's indebtedness to Wheeler from any alternative source.  Thus, when Eike was assisting Debtor and State Bank with the Loan Package, he did not know that Debtor had cattle financed by Wheeler.  He also did not know that Debtor was indebted to Wheeler.  Accordingly, the October Balance Sheet includes no reference to Wheeler.

26.    Debtor testified that he informed Ward of his Wheeler transactions and that Ward kept a file on Wheeler.[12]  However, there is no credible evidence that Ward knew of Debtor's dealings with Wheeler.  Debtor testified that he gave Ward monthly updates, but the Court does not believe that State Bank would fail to keep any kind of records reflecting such knowledge.[13]  Moreover, State Bank's file on the Loan does not contain any notification from Wheeler regarding its financing of cattle purchases for Debtor or any

---

[11]In contrast, Debtor testified that he never farmed wheat.

[12]Of course, Debtor testified that he did not own the cattle financed through Wheeler but rather that Wheeler owned the cattle and that he bought the cattle for Wheeler.  Wheeler's representative strongly denied any purchasing relationship between Wheeler and Debtor and stated the nature of their relationship was lender - borrower.  The Court finds this testimony to be far more credible than Debtor's.

[13]Ward was not questioned at his deposition about Debtor's dealings with Wheeler or whether Debtor updated him monthly on his transactions with Wheeler.

other documentation that State Bank and Wheeler discussed their relative lien priority. Accordingly, the Court does not consider Debtor's testimony to be truthful.

27.   Eike also testified that the balance sheet in the Farm and Home Plan should set forth a current representation of a borrower's financial condition.  According to Eike, prospective representations of a borrower's financial condition should be confined to representations concerning how the loan will cash flow, which are also contained elsewhere in the Farm and Home Plan.  In this respect, Eike's testimony differs materially from Debtor's and Ward's.  The Court finds that Eike correctly explained how the various components of the First Plan, specifically the October Balance Sheet, should have been completed, whereas Debtor and Ward explained how the October Balance Sheet was actually, but incorrectly, completed.

**The Second Plan**

28.   FSA considers a Farm and Home Plan to be a valid representation of a borrower's financial condition for approximately 90 days post-completion of such plan.

29.   Because FSA did not decide whether to guarantee the Loan within 90 days of the First Plan's completion, FSA requested an updated plan from State Bank and Debtor.

30.   According to Eike, FSA requires that a borrower show, via an updated plan, that his or her financial condition is at least as sound as it was at the time of the initial plan.

31.   On April 7, 2010, State Bank, Debtor, and Eike prepared a new Farm and Home Plan dated April 7, 2010, and covering a period from April 1, 2010, to March 31, 2011 (the "Second Plan").  See Ex. 4.

-10-

32.  The Second Plan differed from the First Plan in that Debtor reported ownership of 477

head of cattle valued at $294,251.00 (an increase of 5 head of cattle) on the balance sheet

dated April 7, 2010 (the "April Balance Sheet").  See Ex. 4.

33.  Likewise, Debtor's reported wheat holdings decreased to 80 acres valued at $2,400.00 (a

decrease of 145 acres).  See Ex. 4.  However, per Debtor's testimony, Debtor has never

farmed land.

**State Bank's Reliance Upon Debtor's Statements in the Loan Package**

34.  Although Ward did not testify that he relied upon Eike's appraisal, the Loan Narrative or

Debtor's First Plan or Second Plan when making State Bank's lending decision, he did

testify that he would not authorize the Loan unless FSA agreed to guarantee it.[14]

35.  Ward and Eike testified extensively that FSA will not guarantee a loan that lacks a 1:1

collateral value to loaned funds ratio, and Ward testified extensively that State Bank

would not issue the Loan unless it was backed by an FSA guarantee.

**Loan Approval and Loan Documentation**

36.  Once FSA agreed to guarantee the Loan, State Bank approved the Loan.

37.  On April 7, 2010, Debtor executed a Promissory Note/Security Agreement in favor of

State Bank in the original principal amount of $15,050.00, Loan No. 87992.  See Ex. 10.

38.  On April 21, 2010, Debtor executed four (4) additional Promissory Notes in favor of the

State Bank as follows:

Loan No. 87985        $230,800.00

Loan No. 87986        $ 40,000.00

---

[14]At his deposition, Ward was not asked about Debtor's dealings with Wheeler or whether
Debtor updated him monthly on his transactions with Wheeler.

Loan No. 187987      $298,200.00

Loan No. 187988      $ 70,900.00

See Ex. 6 - 10.

39.    On April 21, 2010, Debtor and State Bank executed four (4) Security Agreements

granting liens in favor of State Bank on virtually almost all of Debtor's personal property

assets (including livestock) to secure the Loan (the "Security Agreements").  See

Ex. 11 - 14.

40.    Each Security Agreement  contains an identical provision concerning financial

representations.   The provision provides:

> All applications, balance sheets, earnings statements, and other
> financial information and representations which have been, or may
> later be, furnished to [State Bank[15]] to induce it to enter into or
> continue a financial transaction with Debtor fairly represent
> Debtor's financial condition as of the date and for the period
> shown in such document.  **All information furnished to [State
> Bank] at any time and in any form is, or shall be at the time
> furnished, true and accurate in all material respects and
> sufficiently complete to give [State Bank] full knowledge of the
> subject matter**.  Debtor will provide to [State Bank] annually, or
> more frequently if [State Bank] so elects, such financial
> information about Debtor's affairs as [State Bank] may reasonably
> request.  Debtor's financial condition has not changed materially
> since the effective date of the last furnished financial information
> except as Debtor has reported to [State Bank] in writing.

See Exs. 11, at 2; 12, at 2; 13, at 2; and 14, at 2 (emphasis added).

41.    At trial, Debtor testified that he understood that the financial representations provision of

each Security Agreement required that he provide an accurate picture of his financial

position, updating State Bank as and when necessary.

---

[15]In the original, the term "Secured Party" is used to describe State Bank.

42.    Due to his past borrowing relationship with State Bank, State Bank previously perfected its security interest in Debtor's collateral through UCC Financing Statements filed January 8, 2002, and February 27, 2007.  <u>See</u> Ex. 15.  State Bank also already had Oklahoma Effective Financing Statements on file covering cattle and calves dating from January 3, 2002, and February 27, 2007.  <u>See</u> Ex. 16.

### Debtor's Dealings with Wheeler

43.    Wheeler has eighteen (18) employees and feeds approximately 32,000 head of cattle at any given time.  Wheeler not only operates a feed lot in Texas but also finances cattle purchases.

44.     For approximately 8 - 10 years,[16] Debtor fed cattle at Wheeler and entered into security agreements whereby Wheeler financed his cattle purchases.

45.    According to Debtor, he bought "Wheeler" cattle at the Auction using funds from his State Bank Account.[17]  Within one (1) business day of Debtor's making a cattle purchase at the Auction, Wheeler wired funds sufficient to cover the purchase price.

46.    Thus, Debtor admitted Wheeler funds were commingled with the proceeds of the Loan in the Account.  Debtor also commingled the proceeds of payments from neighbors and

---

[16]Debtor's business dealings with Wheeler came to a halt in early 2011, approximately the same time his relationship with State Bank and its successor, Bank 7, ended.

[17]As a general observation, Debtor's testimony concerning his relationship with Wheeler frequently confirmed the primary elements of Stacy McCasland's testimony.  Where Debtor's testimony differed, such as concerning ownership of the cattle, the nature of the financial arrangement between Debtor and Wheeler, and Debtor's ongoing indebtedness to Wheeler, his testimony also was contradicted by documentary evidence.  Thus, the Court considers Debtor's testimony concerning his relationship with Wheeler to be truthful only to the extent it is not contradicted by documentary evidence or witness accounts.

other business associates who wrote him checks and asked him to buy cattle on their behalf.[18]

47. Stacy McCasland[19] ("McCasland") is Vice President and Manager of Wheeler. According to McCasland, over the course of 8 - 10 years, Debtor kept between 2,000 and 3,000 head of cattle in Wheeler's feed yard, primarily cattle financed by Wheeler, but at times, some of his non-Wheeler financed cattle.

48. In his testimony, McCasland emphasized that Wheeler never entered into a profit-sharing arrangement with Debtor. It either paid Debtor to purchase cattle on Wheeler's behalf on occasion or, more often, provided financing for Debtor's purchases of resale cattle.

49. Generally speaking, the cattle that Debtor kept at Wheeler were owned by Debtor and subject to Wheeler's purchase money security interest. When Debtor wished to buy cattle at the Auction, Wheeler would provide financing the following day, draft a bill of sale and file a UCC-1 or UCC-3 with the State of Texas.[20]

50. As to each financed head of cattle, Wheeler would deduct principal, interest, and feeding expenses from the sale cost, then credit the balance against Debtor's Account with Wheeler.

---

[18]Debtor deposited such checks in the special State Bank Account that was tied to the Loan.

[19]McCasland testified via deposition taken on July 17, 2014. See Ex. 26. He has worked for Wheeler for more than 25 years.

[20]Although Debtor testified that he purchased cattle on behalf of Wheeler and that Wheeler owned the cattle rather than Debtor, McCasland vehemently denied that this was the nature of the relationship. Occasionally, Debtor would buy cattle for Wheeler; however, Wheeler did not issue bills of sale or file financing statements when Debtor purchased cattle on behalf of Wheeler.

51. On February 17, 2009, Debtor executed a security agreement (the "Wheeler Security Agreement") in favor of Wheeler. It affords Debtor the funds necessary to purchase "cattle, to pay feed bills and other charges against the cattle, and for any other miscellaneous costs which become due and payable to Wheeler as a result of cattle feeding transactions." See Ex. 25, at 1.

52. The Wheeler Security Agreement also evidences Debtor's agreement that Wheeler "may apply such cattle proceeds as it may receive from the sale of Debtor's cattle to [debts due and owing under the Wheeler Security Agreement] at any time such proceeds are received." See Ex. 25, at 1.

53. Under cross-examination, Debtor admitted that, when he transported cattle to Wheeler for feeding, Wheeler handled the sale of such cattle. Debtor also conceded that, if and when Wheeler sold his cattle, the proceeds were not distributed to Debtor and State Bank.

54. Instead, Wheeler credited the proceeds against Debtor's balance on his Wheeler line of credit. In his defense, Debtor testified that he only transported cattle to Wheeler that were purchased using Wheeler's financing. However, due to the fact that Debtor admitted that he regularly commingled funds in the Account, the Court is unable to share Debtor's confidence that he never (i) transported cattle purchased using State Bank funds to Wheeler[21] and (ii) sold such cattle free and clear of State Bank's lien.[22]

_____

[21]McCasland's testimony supports the proposition that Debtor transported State Bank-financed cattle to Wheeler.

[22]However, Bank 7 presented **no proof** quantifying the number of cattle subject to State Bank's lien that were sold at Wheeler. In the case of such sales, Wheeler would have applied the proceeds to Debtor's Wheeler indebtedness, but the Court lacks evidence from which it can form an opinion concerning the amount of revenue Debtor allowed to be diverted to the wrong

**Because Debtor Failed to Disclose His Transactions with Wheeler, State Bank Did
Not Know the Extent to Which His Loan-related Representations Were Inaccurate
and Did Not Realize That Debtor Sold Cattle Free and Clear of its First Lien**

55.     Debtor confirmed the accuracy of certain Wheeler records of cattle purchases, transfers

and sales which have a bearing on the accuracy of his October Balance Sheet.

56.     For instance, on September 4, 2009, Eike performed his appraisal of Debtor's cattle.  Eike

determined that Debtor owned 472 head of cattle.  See Ex. 5, at 1.

57.     Immediately thereafter, Debtor made a series of cattle transfers to Wheeler as follows:

> September 8, 2009 - Debtor transported 107 head of cattle to Wheeler.
> See Ex. 26, at 404.
>
> September 10, 2009 - Debtor transported 15 head of cattle to Wheeler.
> See Ex. 26, at 404.
>
> September 11, 2009 - Debtor transported 78 head of cattle to Wheeler.
> See Ex. 26, at 406.
>
> September 16, 2009 - Debtor transported 87 head of cattle to Wheeler.
> See Ex. 26, at 408.
>
> September 18, 2009 - Debtor transported 99 head of cattle to Wheeler.
> See Ex. 26, at 408.
>
> September 26, 2009 - Debtor transported 79 head of cattle to Wheeler.
> Ex. 26, at 410.

Thus, less than one (1) month after Eike's appraisal, only seven (7) head of cattle that

Debtor reported to State Bank as otherwise-unencumbered collateral that would secure

the Loan remained within Oklahoma.  The remaining cattle were in a feed yard in Texas

and, ultimately, were sold subject to Wheeler's purchase-money security interest instead

_____

creditor.  Because of the extent to which Debtor commingled funds, Bank 7 may not have been
able to provide such evidence.

of State Bank's security interest.  State Bank did not receive the proceeds of Wheeler's sales.

58.  More importantly, Debtor did not change the cattle count on the October Balance Sheet to reflect the cattle transferred to Wheeler; the October Balance Sheet contains the same head count as the Appraisal - 472 head of cattle.

59.  Financiers often take steps to protect against a debtor's sale of cattle free and clear of applicable liens.  Practices vary, and some distinctions may be drawn based upon the identity of the financier.  Many feed yards finance their customers' purchases of cattle.

60.   According to Eric Thompson ("Thompson"),[23] an executive vice president of Bank 7, when a customer purchases cattle financed by a feed yard, the cattle are usually branded using the feed yard's brand.  This custom prevents the customer from shipping the cattle to another state for sale in another feed yard's auction barn or any other auction barn.  According to Thompson, auctioneers and buyers throughout the United States are familiar with the brands used by large-scale feed yards such as Wheeler.

61.  Debtor seized upon Wheeler's common practice of branding cattle in which it holds a valid lien to argue that (i) Debtor and Wheeler had a profit-sharing arrangement, (ii) Wheeler owned the cattle because it had Wheeler's brand,[24] or (iii) he bought the

---

[23]Thompson has worked for Bank 7 for 6 years.  He manages Bank 7's branch banks that are located outside of the Oklahoma City metropolitan area.  Thompson spent 26 years working in the banking sector and is experienced in agricultural lending, including cattle loans.  He has worked on FSA-guaranteed loans before, each time hiring a loan packager.  In at least one instance, he hired Eike, whom he has known for 15 years in a professional capacity.

[24]Of all of Debtor's excuses and explanations, the notion that he did not own cattle that he purchased from sale barns and later resold because such cattle were branded with Wheeler's brand was the most galling.  Debtor devoted significant time and attention to advancing this

cattle for Wheeler and Wheeler compensated him for his costs and expenses. McCasland expressly rejected the notion that Wheeler entered into a profit-sharing arrangement. He explained that Wheeler occasionally paid Debtor to purchase cattle for it but discontinued this practice fairly early in its business relationship with Debtor. **By 2009, Debtor only purchased cattle for himself using Wheeler financing.**

62.    Debtor's undisclosed relationship with Wheeler caused State Bank and Bank 7 to suffer significant financial losses. According to Thompson, Wheeler sold $1,868,518.89 worth of cattle owned by Debtor and financed by Wheeler free and clear of State Bank's lien.

### Wheeler Notices Debtor's Financial Problems

63.    McCasland believes that Debtor encountered financial problems in late 2010 or early 2011.[25] He developed his belief because, at that approximate time, Debtor lost several head of Wheeler-financed cattle and could not explain how he lost those cattle.

64.    According to Debtor's initial testimony, he lost approximately 40 head of cattle financed by Wheeler and valued at approximately $20,000.00 in a fire. He later claimed the same cattle to have been struck by lightning.

65.    However, Sharon Wilson, Debtor's ex-wife,[26] testified that, during the time period of 2010 through 2011, Debtor owned anywhere between 400 and 500 head of cattle at any

---

narrative. Ultimately, Debtor conceded that a bona fide purchaser of cattle from a sale barn rightfully owns such cattle, even if a third party's brand appears on the cattle.

[25]Debtor owes Wheeler approximately $20,000.00, plus interest.

[26]Based on her demeanor and her testimony, the Court concludes there is no love lost between Sharon Wilson and Debtor.

given time[27].  Ms. Wilson disputed Debtor's contention that he lost approximately 40 head of cattle financed in a fire.  She testified that no such fire occurred.

66.    When Debtor returned to the stand for rebuttal, he testified that lightning killed the lost cattle.[28]

67.    Ms. Wilson and Debtor had two children together:  Macy and Monty.  Per Ms. Wilson, neither Macy nor Monty owned or sold cattle.  However, Ms. Wilson admitted that Debtor sometimes bought and sold cattle using their names.

68.    In rebuttal, Debtor stated that cattle he sold under his children's names did, in fact, belong to his children.  For instance, Macy always owned 10 - 20 head of cattle.  She used such cattle to practice for and compete in 4-H roping events.  Debtor testified that he occasionally sold some of Macy's cattle and bought her replacements.  He further testified that the proceeds from each of his children's cattle sales were placed into the respective child's savings account.

69.    The documentary evidence provides an alternative explanation for Debtor's sale of cattle under his children's names.  According to the documents, Debtor sold approximately 30 head of cattle under his children's names in the months subsequent to the reported loss of 40 Wheeler-financed head of cattle.[29]

---

[27]Ms. Wilson was working full time during that time period, but said she was still in a position to know Debtor's business activities.  According to Ms. Wilson, she helped Debtor with his cattle business and its operations during the weekends.

[28]Unfortunately, Debtor lacked any form of insurance on the cattle.  Consequently, he could neither reimburse Wheeler nor replace the cattle.

[29]  On August 26, 2011, Macy sold 27 head of cattle at the Woodward Livestock Auction. See Ex. 31, at 1.  Two months prior, on June 17, 2011, Debtor sold two (2) head of cattle at the

70.     Because of the generally implausible nature of Debtor's testimony, the Court is unable to

accept his explanation for the preceding cattle sales.  Instead, it finds that the preceding

sales demonstrate that Debtor sold the cattle which allegedly perished in a fire, then a

lightning storm, free and clear of Wheeler's valid lien, leaving Debtor in a deficit

collateral position with Wheeler.[30]

**State Bank Fails, Debtor Defaults on the Loan, Conceals its Proceeds
and Bank 7 Learns of Debtor's Financial Difficulties**

71.     In January 2011, State Bank failed.  Bank 7 acquired State Bank and its assets, including

the Loan, through a Purchase and Assumption Agreement by and between Bank 7 and the

FDIC dated January 28, 2011.  See Ex. 17.

72.     In spite of State Bank's failure, Debtor continued to make payments on the Loan at least

until March 21, 2011.

73.     Shortly after Debtor quit making payments on the Loan, he made a suspect transfer from

the State Bank Account.  On April 7, 2011, Debtor drafted a $35,750.00 check (the

"Check") on the State Bank account to the order of the F & E Wilson Family L.L.C.  See

Ex. 35.  According to the memo line on the Check, Debtor made the payment for "cattle"

or at least, the Check related to "cattle."  See Ex. 35.

---

Woodward Livestock Auction.  See Ex. 31, at 2.

[30]Debtor also alleged that McCasland was a personal friend.  Per Debtor, after the fire,
McCasland came to visit him, and they discussed the fire.  McCasland apparently expressed his
understanding and empathy; he even orally forgave Debtor's indebtedness to Wheeler.
McCasland's testimony did not cover this topic in detail, but McCasland testified Debtor remains
indebted to Wheeler for approximately $20,000.00.  It stands to reason that McCasland would
not state that Debtor remains indebted to Wheeler if he actually visited Debtor's ranch and
forgave such debt.  Consequently, for the reasons set forth repeatedly as to Debtor's lack of
credibility, the Court rejects Debtor's explanation.

74.  According to Debtor, he was indebted to his parents, Flakey and Ellen Wilson, and had been for the past year.  When State Bank failed, Debtor began to worry that he might lose the funds and with them, the ability to repay his parents.  For that reason, he decided to pay them on April 7, 2011.

75.  On cross-examination, Debtor was unable to recall why he wrote "cattle" on the Check.  To the best of Debtor's knowledge, his parents had not owned cattle for several years preceding the issuance of the Check.

76.  Debtor's explanation for the Check is implausible.  His father, Flakey Wilson's explanation for the Check was equally implausible.  Moreover, Debtor's financial records suggest that Debtor was not repaying a debt owed to his parents (and the debt was not disclosed in the April Balance Sheet, which covered a period of time when the debt would have been incurred).

77.  Instead, Debtor was depleting the State Bank Account to prevent State Bank from setting off the balance of the Account against the Loan indebtedness as it was then in default.  The Court reaches this conclusion because, less than a week later on April 13, 2011, Flakey and Ellen Wilson gave Debtor two (2) cashier's checks in the combined amount of $35,750.00.  See Ex. 36.  Debtor deposited the checks into a non-State Bank account.

78.  According to Thompson, there were several reasons Bank 7 did not become aware of Debtor's financial problems until he defaulted on the Loan and depleted the Account.

   •  First, when Bank 7 agreed to assume State Bank, it lacked a complete understanding either of State Bank's assets or its liabilities.  Bank 7 personnel decided to take what amounts to a triage approach when conducting its post-

acquisition due diligence concerning State Bank's outstanding loans. Bank 7 personnel believed at the time that State Bank's lowest risk assets were its FSA-guaranteed loans.

- Nothing in State Bank's files concerning Debtor belied Bank 7's aggregate evaluation of State Bank's FSA-guaranteed loan portfolio. Yet, those files were inaccurate at the most elementary level. For instance, Debtor's business was supposed to be a stocker cattle operation; instead, it ran on feeder cattle.[31]

- Moreover, nothing in State Bank's file indicated that Debtor only owned 60 - 70 head of cattle when he sought or obtained the Loan.

- Finally, Debtor pledged a first lien on resale cattle to State Bank, but granted a purchase money security interest in the same cattle to Wheeler. Because Debtor sold so many of his cattle through Wheeler's sale barn, most of his resale cattle were sold free and clear of State Bank's lien. It was only after the fact, when Debtor had defaulted and litigation ensued, that Bank 7 discovered the nature and extent of Debtor's misstatements and omissions.

---

[31]In broad terms, "[s]tocker animals are those that will be used in some type of forage-intensive growing program to produce feeder cattle. Feeder cattle are those cattle with sufficient weight/finish to enter feedlots and finish on high concentrate diets. . . . The distinction between stocker and feeder cattle is not a simple matter of age or weight. While it is obvious that lightweight calves are stockers and heavyweight yearlings are feeders, animals in the middle of the range may go either way, depending on location, time of year, animal type, and a variety of market factors. As a general rule, animals over 600 lbs., especially if the animal is reasonably fleshy, will be considered feeders. Thinner and lighter animals will likely enter some sort of grazing/backgrounding program before going to a feedlot for finishing."  D. Peel & C. Ward, "Feeder Cattle Production and Marketing," Beef Cattle Handbook, BCH-8550, at 3 (available at: http://www.iowabeefcenter.org/Beef%20Cattle%20Handbook/Feeder_Cattle_Production_Marketing.pdf, last visited on September 11, 2014).

**Bank 7's State Court Litigation Against Debtor**

79.   Bank 7 filed suit in the District Court of Ellis County, State of Oklahoma, in order to

collect on Debtor's debts to Bank 7.  By Journal Entry of Partial Summary Judgment

entered March 19, 2013 (the "Journal Entry"), the District Court of Ellis County, State of

Oklahoma, rendered judgment for Bank 7 and against Debtor on the promissory notes

executed by Defendant, as follows (together with interest, late charges, costs and attorney

fees):

| Note No. | Balance, effective March 19, 2012 |
|----------|-----------------------------------|
| 87985    | $257,205.30                       |
| 87986    | $ 42,248.70                       |
| 187987   | $337,157.38                       |
| 187988   | $ 79,857.82                       |
| 87992    | $ 16,697.64                       |

See Ex. 18.

## ANALYSIS AND CONCLUSIONS OF LAW

### Relevant Statutory Authority

11 U.S.C. § 523(a)(2) and (a)(6) provide, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
does not discharge an individual debtor from any debt—

   (2) for money, property, services, or an extension, renewal, or refinancing
   of credit, to the extent obtained by—

      (A) false pretenses, a false representation, or actual fraud,
      other than a statement respecting the debtor's or an
      insider's financial condition;

      (B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an
insider's financial condition;

(iii) on which the creditor to whom
the debtor is liable for such money,
property, services, or credit
reasonably relied; and

(iv) that the debtor caused to be
made or published with intent to
deceive.
. . .

(6) for willful and malicious injury by the debtor to another entity
or to the property of another entity;

Id.

## **Burden of Proof**

Bank 7 carries the burden of proving each of the elements of its claims under Section

523(a) by a preponderance of the evidence.  See, e.g. Grogan v. Garner, 498 U.S. 279, 290-291

(1991).  The exceptions to discharge contained in Section 523(a) are to be narrowly construed

and, because of the fresh start objections of bankruptcy, doubt is to be resolved in Debtor's favor.

Cobra Well Testers, LLC v. Carlson (In re Carlson), 381 B.R. 417 (10th Cir. 2008) (citing Bellco

First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997)).

I.    **BANK 7 DOES NOT STATE A CLAIM UNDER SECTION 523(a)(2)(A).**

Section 523(a)(2)(A) expressly excepts statements respecting a debtor's financial

condition from its coverage; statements respecting a debtor's financial condition fall exclusively

within Section 523(a)(2)(B).  Lazaron v. Lucas (In re Lucas), 386 B.R. 332, 335 (Bankr. D. N.M.

2008) (citing 11 U.S.C. § 523(a)(2)(A)).  Thus, this Court must make a determination whether

-24-

the representations on which Bank 7 bases its claims are "respecting the debtor's or an insider's financial position." If the statements are with respect to Debtor's financial condition and are in writing, then those statements must be judged under Section 523(a)(2)(B) rather than Section 523(a)(2)(A). GDO Investments, Inc. v. Glasgow (In re Glasgow), 370 B.R. 362, 372 (Bankr. D. Colo. 2007).

The Tenth Circuit Bankruptcy Appellate Panel has interpreted "respecting the debtor's or an insider's financial position" narrowly as "'a statement of a debtor's net worth, overall financial health, or ability to generate income.'" Glasgow, 370 B.R. at 372 (citing Cadwell v. Joelson (In re Joelson), 307 B.R. 689, 696 (10th Cir. BAP 2004)). See also Lucas, 386 B.R. at 336. Based on this statutory language, discharge of claims based on fraudulent written statements concerning a debtor's financial condition must be brought pursuant to Section 523(a)(2)(B) rather than Section 523(a)(2)(A). Phoenix Equity Ventures, LLC v. Baillio (In re Baillio), 2010 WL 3782065 (Bankr. D. N.M. 2010).

In this case, the Court concludes that the representations and/or material omissions made by Debtor on which State Bank allegedly relied in making the Loan are entirely written statements concerning Debtor's financial condition. The representations or omissions are all contained in either the Loan Package, including the Loan Narrative and the October Balance Sheet, and the April Balance Sheet. The representations or omissions concern Debtor's financial condition as they address assets owned and liabilities owed by Debtor.

Accordingly, Bank 7's claim under Section 523(a)(2)(A) must be denied as Bank 7 only presented evidence of Debtor's written misrepresentations in or omissions from written

statements concerning Debtor's financial condition, which, by statute, must be judged under Section 523(a)(2)(B).

## II.    BANK 7's SECTION 523(a)(2)(B) CLAIM FAILS.

In order for a debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B), the plaintiff must prove that the debt[32] was incurred using (i) a written statement that is materially false, (ii) respecting the debtor's financial condition (or insiders), (iii) that debtor caused to be published with intent to deceive, and (iv) on which the creditor **reasonably** relied.  Salim Investments, Ltd. v. Benton (In re CSI Enterprises, Inc.), 2000 WL 93989, * 2 (10th Cir. Jan. 28, 2000) (unpub.) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991) (emphasis added)).

### A.    The Loan was Incurred Using Written Statements that are Materially False.

A claim under Section 523(a)(2)(B) can be brought only if Debtor provided a written financial statement to State Bank that is materially false.  See Bellco First Fed. Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361-62 (10th Cir.1997); accord Joelson, 427 F.3d at 712 (Section 523(a)(2)(B) liability must be predicated on "a false written statement [that] describe[s] the debtor's net worth, overall financial health, or ability to generate income.").

Debtor made several false representations and material omissions to State Bank. Debtor's affirmative false representations generally involved the presentation of his hoped-for, prospective financial condition upon receipt of the Loan as his actual, current financial condition in the October Balance Sheet and the April Balance Sheet.  First, Debtor claimed to have an interest in wheat crops in the October Balance Sheet and the April Balance Sheet (although in a

---

[32]The parties stipulate that Debtor obtained money from State Bank and that Bank 7 stands in State Bank's shoes for purposes of this action.

reduced amount).  See Ex. 1, at 14 and Ex. 4.  However, Debtor conceded at trial that he had

never farmed wheat in his life.  Second, Eike inspected Debtor's cattle in September 2009 with

Debtor and determined a head count of 472.  See Ex. 5.  This number of head of cattle carries

over to both the October Balance Sheet and the April Balance Sheet.  See Ex. 1, at 14 and Ex. 4.

However, shortly after the Appraisal, Debtor transported virtually all of the cattle inspected and

appraised to Wheeler.  See Ex. 26 at 404, 406, 408 and 410.  Moreover, Debtor testified that he

owned only 60 - 70 head of cattle when he completed the First Plan (i.e., when the October

Balance Sheet was executed).  Nevertheless, he informed State Bank that he owned 472 head of

cattle, and he remained silent when Eike confirmed this count during his Appraisal.[33]  Debtor

also made no material adjustment to the cattle head count in the April Balance Sheet.

Debtor also omitted material aspects of his financial condition from the Loan Package.

He did not disclose his relationship with Wheeler to State Bank or its representatives.  In the

same month that Eike performed the Appraisal on Debtor's cattle, Debtor failed to disclose the

existence of his relationship with Wheeler and the fact that he was indebted to Wheeler in the

amount of $178,384.03.[34]  And, when he executed the Loan Package, including the Loan

Narrative and the October Balance Sheet, he failed to disclose the fact that he was indebted to

_____

[33]Ms. Wilson testified that during the time period of 2010 through 2011, Debtor owned anywhere between 400 and 500 head of cattle at any given time.  Thus, the First Plan appears to set out more accurate numbers than Debtor volunteered via live testimony, but the Plan still does not account for other cattle owned by Debtor and located at Wheeler.

[34]On September 30, 2009, Debtor owed Wheeler $60,392.86 for cattle associated with Lot No. 01-4236.  He also owed Wheeler $72,526.69 for cattle associated with Lot No. 01-4264.  Ex. 26, at 284.  On the same date, Debtor owed Wheeler $45,464.48 for cattle associated with Lot No. 01-4271.  Ex. 26, at 283.

Wheeler in the approximate amount of $221,406.90.[35]

**B.   The Loan Package and the April Balance Sheet Concern Debtor's Financial Condition.**

The Loan Package generally describes Debtor's financial condition through a discussion[36] of his debt service ratios, historical performance, repayment sources, capital, collateral sources, balance sheet, and cash flow statements.  The April Balance Sheet is just what it purports to be, a financial statement giving a snapshot, as of April 7, 2010, of Debtor's assets and liabilities.

The Court concludes that the Loan Package and the April Balance Sheet are in fact written statements concerning Debtor's financial condition.

**C.   Debtor Created and/or Published the Loan Package and the April Balance Sheet with the Requisite Intent to Deceive.**

A statement need not be made with an actual intent to deceive in order to satisfy Section 523(a)(2)(B)'s scienter requirement; instead "reckless disregard for the truth" is sufficient to make the underlying debt nondischargeable.  Central Nat'l Bank & Trust Co. of Enid, Okla. v. Liming (In re Liming), 797 F.2d 895, 897 (10th Cir.1986) (citing Carini v. Matera, 592 F.2d 378, 380-81 (7th Cir.1979)); Houtman v. Mann (In re Houtman), 568 F.2d 651, 655-56 (9th

---

[35]On November 30, 2009, Debtor owed Wheeler $73,371.02 for cattle associated with Lot No. 01-4236.  Ex. 26, at 283.  He also owed Wheeler $90,334.01 for cattle associated with Lot No. 01-4264.  Ex. 26, at 284.  For cattle associated with Lot No. 01-4271, Debtor owed Wheeler $57,701.87.  Ex. 26, at 286.

[36]According to the Loan Narrative contained within the Loan Package, Debtor had "total farm assets of $623,680.00, total liabilities of $585,565.00, creating equity of $38,115.00." Ex. 1, at 3.  Debtor's then-"[c]urrent assets of $312,680.00 [] include[d] livestock inventory valued at $305,930.00 and 225 acres of growing wheat valued at $6,750.00."  Id.

Cir.1978)); 3 L. King, Collier on Bankruptcy ¶ 523.09[5][b], at 523-61 (15th ed. 1981)

[hereinafter cited as Collier].

In considering whether Debtor properly contested Bank 7's showing that Debtor

displayed at least a reckless disregard for the truth, this Court notes that "unsupported assertions

of an honest intent will not overcome the natural inferences from admitted facts." Liming, 797

F.2d at 897 (quoting 3 Collier ¶ 523.09[5][b], at 523-62; see also In re Moran, 456 F.2d 1030,

1030-31 (3d Cir.1972), cert. denied, 409 U.S. 872 (1972); In re Monsch, 18 F.Supp. 913, 915

(E.D.Ky.1937)).

The Court must distinguish between Debtor's affirmative misrepresentations and his

material omissions.  Ward's testimony suggests that he and Debtor generally were on the same

page with respect to how the Loan Package should be completed.  Ward concurred with, or at

least acquiesced to, Debtor's decision to include in his assets listed in the October Balance Sheet

cattle that he intended to acquire, but did not currently own.  For this reason, the Court finds that

there was no intent to deceive State Bank about the number of cattle owned by Debtor.[37]

Another affirmative misrepresentation concerns Debtor's ownership of wheat as reflected

in both the October Balance Sheet and the April Balance Sheet.  See Ex. 1, at 14 and Ex. 4.

Because Debtor testified that he never farmed wheat, the Court concludes that his inclusion of

wheat as an asset on the balance sheets was intentional.  However, the Court places the wheat in

the same category as the cattle as far as Debtor's intent to deceive given the long-standing

lending relationship between Debtor and State Bank, and gives the benefit of the doubt that the

---

[37]Any intent to deceive was an intent to deceive FSA in considering whether to guarantee
the Loan.

-29-

inclusion of the wheat was to bolster the chances of obtaining the FSA guarantee and not to mislead State Bank.

In contrast, the omission of the Wheeler indebtedness from the October Balance Sheet in the Loan Package and from the April Balance Sheet was an intentional omission designed to deceive State Bank. There is no evidence suggesting that State Bank had even the slightest inkling that Debtor (i) was doing business with Wheeler, (ii) was heavily indebted to Wheeler and (iii) would transport cattle purchased using funds from the Account to Wheeler, who would then feed and sell such cattle free and clear of First State's lien and apply the proceeds to the indebtedness owed to Wheeler.

The Court does not believe mere carelessness can explain Debtor's failure to disclose this information; the transactions were too significant. After all, in the same month that Eike performed the Appraisal (i.e., September 2009), Debtor was indebted to Wheeler in the amount of $178,384.03. And, when he executed the Loan Package (including the Loan Narrative and the October Balance Sheet), he was indebted to Wheeler in the approximate amount of $221,406.90. Furthermore, by transporting cattle to Wheeler in Texas for sale free and clear of State Bank's lien (which was perfected in Oklahoma), this Court is left with the inescapable conclusion that Debtor intended to deceive State Bank as to the existence of Wheeler's indebtedness secured by Debtor's cattle.

Additionally, unless the First and Second Plans demonstrated a 1:1 ratio of collateral value to loaned funds, FSA would not have guaranteed the Loan, and State Bank would not have made the Loan. If Debtor disclosed his Wheeler indebtedness to State Bank, he could not have listed his cattle as collateral for the Loan. The cattle would not have qualified as collateral for

-30-

the Loan because it was already encumbered by another party's first priority lien.  Thus, the

Court finds that Debtor possessed the requisite intent to defraud State Bank with respect to the

omission of the Wheeler indebtedness from the Loan Package (including the Loan Narrative and

the October Balance Sheet) and the April Balance Sheet.

      **D.**      **State Bank did not Reasonably Rely on the Loan Package and the April Balance Sheet.**

Bank 7 must also show that State Bank "actually relied on the financial statement and that

its reliance was reasonable."  First Nat'l Bank v. Cribbs (In re Cribbs), 2006 WL 1875366, *2

(10th Cir. July 7, 2006) (unpub.) (citing Field v. Mans, 516 U.S. 59, 68 (1995)).  Bank 7 is not

required to show that it relied exclusively upon Defendant's false written statements.  According

to the Tenth Circuit, "[p]artial reliance is enough."  Id., 2006 WL 1875366 at *3 (quoting Central

Nat'l Bank & Trust Co. v. Liming (In re Liming), 797 F.2d 895, 897-98 (10th Cir.1986) (internal

citation omitted)).  Thus, "a debt is obtained by fraud if the fraud is a substantial factor in the

creditor's decision."  Id. (quoting John Deere Co. v. Gerlach (In re Gerlach), 897 F.2d 1048, 1052

(10th Cir.1990) (internal quotation omitted)).

Additionally, this Court evaluates the reasonableness of any claimed reliance "according

to the particular facts and circumstances present in a given case."  Cribbs, 2006 WL 1875366 at

*4 (quoting First Bank of Colo. Springs v. Mullet (In re Mullet), 817 F.2d 677, 679 (10th

Cir.1987), abrogated on other grounds by Field, 516 U.S. at 74-75)).  This Court considers the

following factors to be relevant to its inquiry:  (i) the creditor's standard lending practices;

(ii) industry standards; and (iii) "the surrounding circumstances at the time the debtor applies for

credit, including whether there are any 'red flags' in the application, whether there was an

ongoing business relationship, and whether further investigation would have revealed inaccuracies in the debtor's application." Cribbs, 2006 WL 1875366 at *4 (citing Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1117 (3d Cir.1995); Mullet, 817 F.2d at 681)). When a creditor follows its own standard lending practices, this Court generally will conclude that its reliance was reasonable unless the particular facts of the case show that such practices are insufficient under the circumstances. Cribbs, 2006 WL 1875366 at *4 (citing Norwest Card Serv. v. Barnacle (In re Barnacle), 44 B.R. 50, 54 (Bankr. D. Minn.1984) (holding that reliance is reasonable "if a creditor's actual conduct followed its normal business practices and/or standards in the industry *and if the creditor, upon the particular facts acted with ordinary diligence.*") (emphasis original)).

State Bank followed its standard practices concerning FSA-guaranteed loans. It hired Eike as its loan packager. According to Thompson, Eike's due diligence measures met industry standards. Debtor was a long-time customer of State Bank and had not defaulted on prior loans. Further investigation within Oklahoma would not have revealed Debtor's fraud; however, if Eike had performed a Texas lien search, he would have discovered Debtor's relationship with Wheeler. What cannot be ignored is the fact that Ward instructed Debtor to make false statements in his Loan Package, and Debtor acquiesced. In effect, Ward, as president of State Bank, knew not only that Debtor was capable of lying, but also that Debtor presently was falsely representing his financial condition in order to obtain the Loan. Ward was clearly on notice that Debtor was comfortable falsely representing his financial condition and should have known that he could not trust Debtor to honestly report his financial condition to State Bank. For this reason, more investigation was warranted.

-32-

Additionally, State Bank hired Eike to conduct the Appraisal, in which he identified 472 head of cattle.  In contrast, Debtor testified that he only owned between 60 - 70 head of cattle at the time.  Further, Ward apparently knew that the cattle count was incorrect.  That being the case, a red flag should have been obvious to State Bank:  the origin and ownership of hundreds of head of cattle on Debtor's land were unknown.

Under the circumstances, State Bank did not act with ordinary diligence.  As a result, State Bank's reliance upon the accuracy of Debtor's First Plan and Second Plan was unreasonable.

Because Bank 7 did not prove by a preponderance of the evidence that State Bank reasonably relied on the omission of the Wheeler indebtedness and transactions from the Loan Package and the April Balance Sheet, judgment must be entered in favor of Debtor and against Bank 7 on the Section 523(a)(2)(B) claim.

## III.    BANK 7'S SECTION 523(a)(6) CLAIM SUCCEEDS ONLY AS TO THE CHECK.

"In order to prove the nondischargeability of a debt under § 523(a)(6), the plaintiff must demonstrate that the debt at issue is for 'willful and malicious injury by the debtor to another entity or to the property of another entity.'" Tulsa Spine and Specialty Hosp., L.L.C. v. Schoen (In re Schoen), 407 B.R. 420, 428 (Bankr. W.D. Okla. 2009) (citing 11 U.S.C. § 523(a)(6)). Under Section 523(a)(6), "unless a debt is the result of a willful and malicious act intended to do injury to a person, the debt is discharged."  Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129 (10th Cir. 2004).  "Section 523(a)(6) requires 'willful and malicious injury by the debtor,' which we have interpreted to mean that 'the debtor must intend that conversion of the collateral injure the creditor or the creditor's lien interest.'" Columbia State Bank, N.A. v. Daviscourt (In re

Daviscourt), 353 B.R. 674, 687 (10th Cir. BAP 2006) (citing Mitsubishi Motors Credit of Am.,

Inc. v. Longley (In re Longley), 235 B.R. 651, 657 (10th Cir. BAP 1999)).  To prevail on a claim

under Section 523(a)(6), a creditor must prove that the debtor's objectionable conduct caused

"willful and malicious injury[38]," i.e., "that the actor intended the *consequences* of an act, not

simply the act itself."  Berrien v. Van Vuuren, 280 F. App'x 762 (10th Cir. 2008) (citing

Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)).  For debt to

become nondischargeable under Section 523(a)(6), "the debtor must desire to cause the

consequences of his act or believe that the consequences are substantially certain to result from

it."  Berrien, 280 F. App'x. 762 (citing Panalis v. Moore (In re Moore), 357 F.3d 1125, 1129

(10th Cir.2004)).  The burden of proving such intent rests on the creditor asserting

nondischargeability. Berrien, 280 F. App'x 762.

This Court must focus on Debtor's subjective intent when determining whether the injury

was intended or unintended because Bank 7 may only prevail under the "willful and malicious

injury" exception to dischargeability in Section 523(a)(6) if it can demonstrate that Debtor

wished to cause injury or at least believed it was substantially certain to occur.  Berrien, 280 F.

App'x 762.  When injury was neither desired nor in fact anticipated by the debtor, it is outside

the scope of the statute.  Berrien, 280 F. App'x 762 (citing Geiger, 523 U.S. at 62).  Debtor must

have the actual intent to injure State Bank given the required subjective inquiry.

---

[38]Because of Congress' use of the conjunctive *and*, a creditor seeking to prevail on a
Section 523(a)(6) claim must prove that the debtor's conduct was both willful and malicious.
Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley), 235 B.R. 651, 655 (10th Cir.
BAP 1999) (failure of a creditor to establish either willfulness or malice renders the debt
dischargeable).

Bank 7 claims two (2) instances of willful and malicious injury caused by Debtor's actions:  (i) Debtor's transferring and selling cattle and using the sale proceeds thereof inconsistent with State Bank's lien; and (ii) Debtor's transferring the Account balance to his parents which was subsequently returned to him for deposit in an account at a different bank. The requisite intent may be shown indirectly by evidence that the debtor knew of the creditor's lien rights and that the debtor knew his conduct would cause injury.[39]  Turner v. Deutsche Financial Serv. Corp. (In re Turner), 2003 WL 23838108 (Bankr. D. Kan. 2003) (citing Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley), 235 B.R. 651, 657 (10th Cir. BAP 1999)).

Conversion can under certain circumstances give rise to a non-dischargeable debt pursuant to Section 523(a)(6); alternatively, a conversion might be innocent or technical, i.e., an unauthorized assumption of dominion without willfulness or malice.  Longley, 235 B.R. at 657 (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)).  For conversion to be willful under Section 523(a)(6), the debtor must have intended that the conversion of the collateral injure the creditor or the creditor's lien interest.  Longley, 235 B.R. at 657.  Intent may be established by either direct or indirect evidence - direct evidence of specific intent to harm a creditor or its property or indirectly by evidence of the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury to the creditor.  Longley, 235 B.R. at 657.

---

[39]A third basis was contained in the Final Pretrial Order [Doc. 40, at 5, ¶ I.G.5], specifically transferring rental proceeds inconsistent with State Bank's mortgage lien.  However, no evidence was presented at trial on this basis for a Section 523(a)(6) claim, and it is deemed waived by Bank 7.

### A.    Debtor Did not Possess the Requisite Intent with Respect to the Cattle Sales and Application of Sale Proceeds.

Debtor was well aware that State Bank had a valid lien on Debtor's cattle.  By moving cattle from his Oklahoma ranch to Texas for feeding and sale at Wheeler, Debtor may have been converting State Bank's collateral when he failed to remit the sale proceeds to State Bank. Although Debtor deceptively concealed his business relationship with Wheeler from State Bank, the Court finds no evidence was presented at trial that Debtor acted maliciously with respect to the sale of cattle and application of the sale proceeds to Wheeler's indebtedness.  To the extent cattle were purchased with financing provided by Wheeler, no malicious intent can be inferred from Debtor's sale of such cattle and application of the proceeds to Wheeler's debt.  Moreover, Bank 7 presented no evidence of any cattle subject to State Bank's lien (and not otherwise subject to Wheeler's purchase money security interest), being sold at Wheeler with the proceeds being misapplied to Wheeler's debt.  It is pure speculation and conjecture that such occurred, and the Court cannot presume that it did.[40]

Accordingly, the Court finds that Debtor did not possess the requisite intent under Section 523(a)(6) with respect to cattle sales and application of the sale proceeds to Wheeler's debt.

### B.    Debtor Possessed the Requisite Intent with Respect to the Transfer of the Account Balance <u>via</u> the Check.

Bank 7's second basis for a Section 523(a)(6) claim has much firmer footing.  After defaulting on the Loan, Debtor inexplicably depleted the State Bank Account for his ultimate

---

[40]The same holds true for Debtor's cattle sales made in his children's names.  There was no evidence presented that the cattle sold were, in fact, subject to State Bank's lien.  In fact, given the volume of sales purchased through financing by Wheeler, it is just as likely that those cattle were financed by Wheeler and subject to its purchase money lien.

benefit.  Shortly after Debtor quit making payments on the Loan in March 2011, Debtor wrote

the $35,750.00 Check on the Account at State Bank payable to F & E Wilson Family L.L.C. on

April 7, 2011.  <u>See</u> Ex. 35.  While Debtor noted "cattle" on the memo line of the Check, his

parents had not owned cattle for several years preceding the issuance of the Check, and Debtor

was unable to recall why he wrote "cattle" on the Check.  His reasoning for issuing the Check

was a desire to pay his parents back and not lose the Account balance as a result of the closure of

State Bank.

  Like many statements made by Debtor, his explanation for the Check is unbelievable.

Debtor's financial records suggest that Debtor was not repaying a debt owed to his parents (as no

debt to his parents was included in either the Loan Package or the April Balance Sheet).  Instead,

Debtor was depleting the Account and keeping the proceeds for his own use.  Buttressing this

conclusion is that, on April 13, 2011, Flakey and Ellen Wilson gave Debtor two (2) cashier's

checks in the combined amount of $35,750.00.  <u>See</u> Ex. 36.  Debtor deposited the checks into a

non-State Bank account for his own use and to the exclusion of State Bank.

  The Court finds that the $35,750.00 transferred by the Check was subject to Bank 7's

lien.  Debtor had already defaulted on the Loan.  He removed the $37,750.00 for the sole purpose

of removing the funds from the reach of Bank 7's possessory lien as Account holder.  The Court

determines that Debtor disguised the withdrawal by writing "cattle" on the Check when it is clear

that no cattle were purchased.   Moreover, Debtor's proffered, innocent explanation did not pass

muster.  Debtor alleged he drafted the Check as payment of a debt owed to his parents.  If that

were true, his parents would not have returned the funds to him so quickly.  Quite simply, Debtor

-37-

converted the Account funds intentionally and with the intent to harm Bank 7 and convert those proceeds to his own use and benefit.

Accordingly, the Court finds that Debtor removed the funds from the Account intentionally and maliciously in order to place the funds beyond the reach of Bank 7's lien. A non-dischargeable judgment will be entered in favor of Bank 7 and against Debtor in the amount of $35,750.00 pursuant to Section 523(a)(6).

## **CONCLUSION**

For the foregoing reasons, the Court hereby FINDS and ORDERS that:

1.      Debtor's debt to Bank 7 is dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and 523(a)(2)(B); and

2.      Bank 7 is entitled to a non-dischargeable judgment in the amount of $35,750.00 under Section 523(a)(6).

IT IS SO ORDERED.

# # #